## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JENNIFER M. DUBUISSON, | : | |
| | : | |
| Plaintiff | : | CIVIL ACTION NO. 4:11-CV-00356 |
| | : | |
| vs. | : | (Complaint Filed 2/24/11) |
| | : | |
| MICHAEL ASTRUE, | : | |
| COMMISSIONER OF SOCIAL | : | (Judge Caputo) |
| SECURITY, | : | |
| | : | |
| Defendant | : | |

## MEMORANDUM

## BACKGROUND

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Jennifer M. Dubuisson's claim for supplemental security income benefits.[1]  For the reasons set forth below we will affirm the decision of the Commissioner.

On August 22, 2008, Dubuisson filed protectively[2] an application for supplemental security income benefits. Tr. 10, 82-88, 93, 95, 116 and 122.[3]  The application was initially denied by the Bureau of Disability Determination[4] on November 12, 2008. Tr.

---

[1]  Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes).  It is designed to help aged, blind or other disabled individuals who have little or no income.

[2] Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

[3] References to "Tr._" are to pages of the administrative record filed by the Defendant as part of his Answer on May 2, 2011.

[4] The Bureau of Disability Determination is a state agency which initially evaluates applications for supplemental security income benefits on behalf of the Social Security

64-68 and 95.   On January 13, 2009, Dubuisson requested a hearing before an administrative law judge. Tr. 70-71.  After about 11 months had passed, a hearing was held on December 8, 2009. Tr. 24-44.  On January 25, 2010, the administrative law judge issued a decision denying Dubuisson's application. Tr. 10-20.  On February 24, 2010, Dubuisson filed a request for review with the Appeals Council and on January 29, 2011, the Appeals Council concluded that there was no basis upon which to grant Dubuisson's request. Tr. 1-6. Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Dubuisson then filed a complaint in this court on February 24, 2011. Supporting and opposing briefs were submitted and the appeal[5] became ripe for disposition on October 3, 2011,  when Dubuisson elected not to file a reply brief.

Dubuisson who was born in the United States on February 19, 1976,[6] has an 11th grade education and can read, write, speak and understand the English language and perform basic mathematical functions. Tr. 29, 40, 82, 126, 132 and 151.   During her elementary and secondary schooling, Dubuisson attended regular education classes. Tr. 132.

---

Administration.  Tr. 65.

[5]Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

[6]At the time of the administrative hearing and the administrative law judge's decision, Montgomery was 33 years of age and considered a "younger individual" whose age would not seriously impact her ability to adjust to other work. 20 C.F.R. §§ 404.1563(c) and 416.963(c). Tr. 67.  The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

Dubuisson has an extremely limited work and earnings history. Tr. 40, 118, 128 and 137.   Her prior work consisted of unskilled, light work [7]   as an assembly worker and

---

[7]The terms sedentary, light, medium and heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) *Light work*.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as  loss of fine dexterity or inability to sit for long periods of time.

> (c) *Medium work*.  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can do sedentary and light work.

> (d) *Heavy work*.  Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

(continued...)

laborer.  Tr. 40 and 128.  Dubuisson had earning in the years 1992 through 1998 and 2004.  Tr. 118.   Her total earnings for those years were $7221.40.  Id.   Dubuisson has not worked since August 1, 2004.  Tr. 127.

Dubuisson  alleges that she became disabled on January 1, 2005, because of morbid obesity, an HIV infection, degenerative joint disease of the left knee, diabetes mellitus, sleep apnea, asthma and depression.  Tr. 5 and 127; Doc. 12, Plaintiff's Brief, p. 1.  Dubuisson contends that she can not work because she "get[s] sick all the time" and has "a lot of trouble with [her] knees."  Tr. 30.  She claims that she "can't stand very long or sit very long."  Id.  She  further contends she is "afraid to go around people to get sick" and has "severe depression."  Id.

Dubuisson's alleged disability onset date of January 1, 2005, has no impact on Dubuisson's application for supplemental security income benefits because supplemental security income is a needs based program and benefits may not be paid for "any period that precedes the first month following the date on which an application is filed or, if later, the first month following the date all conditions for eligibility are met."  See C.F.R. § 416.501.  Dubuisson as stated above filed her application on August 22, 2008.  Consequently, Dubuisson is not eligible for SSI benefits for any period prior to September 1,  2008.

## STANDARD OF REVIEW

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner.  See Poulos v. Commissioner of Social Security, 474

---

[7](...continued)

20 C.F.R. § 416.967.

F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial

evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

**SEQUENTIAL EVALUATION PROCESS**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with

respect to any individual), "work which exists in the
national economy" means work which exists in significant
numbers either in the region where such individual
lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims. See 20 C.F.R. . § 416.920; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[8] (2) has an impairment that is severe or a combination of impairments that is severe,[9] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[10] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she

---

[8] If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further.

[9] The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. § 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 416.923 and 416.945(a)(2).

[10] If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

can perform other work in the national economy. Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[11]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities.  Id; 20 C.F.R. § 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**MEDICAL RECORDS AND OTHER EVIDENCE**

The medical records reveal that Dubuisson was treated for both physical and psychological problems.

On October 28, 2005, Dubuisson was admitted to the Troy Community Hospital, Troy, Pennsylvania, "with a several-day history of right upper quadrant epigastric pain, getting worse." Tr. 192. Physical examinations and testing revealed that she had a problem with her gallbladder and on October 31, 2005, her gallbladder was surgically removed. Id.  Dubuisson was discharged from the hospital on November 5, 2005. Id.  At the time of discharge it was noted that she had no complications during her hospital stay, her condition was excellent, and  she would have a follow-up appointment in two weeks. Id.

The medical records of this hospital stay reveal several items of importance.

---

[11] If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

On October 28, 2005, Dubuisson was asked whether she had any prolonged periods greater than 2 weeks of trouble sleeping, depression, or feelings of guilt, worthlessness or hopelessness. Dubuisson answered "no to all questions." Tr. 239.   When a hospital nurse or attending physician reviewed her systems on October 28, 2005, she denied any cardiovascular, respiratory, musculoskeletal, neurological or psychiatric problems.[12] Tr. 175. Dubuisson's mental status, skin, head, neck/spine, and extremities were all noted to be within normal limits. Id.

On November 28, 2005, Dubuisson had a follow-up appointment regarding her gallbladder surgery with a nurse employed by Richard Husband, D.O., Dubuisson's primary care physician.  Tr. 277-278.  At that appointment a pain assessment was conducted and Dubuisson indicated that she had "none." Tr. 277.   Her blood pressure was 134/82 even though she had been off her medication since the gallbladder surgery. Id. It was noted that Dubuisson had a well healed scar on her abdomen. Tr. 278.   Dubuisson was advised to commence taking her blood pressure medication but Dubuisson told the nurse that she did not wish to do so.  Id.    It was further noted that at the time of her hospitalization her blood sugar was elevated.  Id.   The nurse prescribed 60 Metformin 500 mg "one with meals" and did not authorize a refill of the prescription.[13] Id.

---

[12]"The review of systems (or symptoms) is a list of questions, arranged by organ system, designed to uncover dysfunction and disease." A Practical Guide to Clinical Medicine, University of California, School of Medicine, San Diego, http://meded.ucsd.edu/clinicalmed/ros.htm (Last accessed July 2, 2012).

[13]Metformin (some brand names are Glucophage, Fortamet and Glumetza) "is an oral diabetes medicine that helps control blood sugar levels. Metformin is for people with type 2 diabetes." Metformin, Drugs.com, http://www.drugs.com/metformin.html (Last accessed July 5, 2012).  Type 2 diabetes is a noninsulin-dependent diabetes which occurs

(continued...)

On January 25, 2006, Dubuisson had an appointment with Tricia Williams, M.D., a colleague of Dr. Husband. Tr. 269.  At that appointment Dubuisson complained of swelling in her left knee. Id.   It was noted that Dubuisson had no previous joint swelling. Id. Other than a finding of morbid obesity and tender effusion[14] in the left knee, the results of a physical examination were normal.  Id.  It was noted that Dubuisson was "well appearing" and "in no acute distress;" there was "no erythema or warmth" of the knee; and the knee had full range of motion.  Id. The assessment was that Dubuisson suffered from hemarthrosis[15] of an "uncertain etiology, probably due to unknown injury."  Id.   The blood was removed by inserting a needle into the knee joint.  Id.  Dubuisson was advised to take Ibuprofen for the swelling and pain. Id.

On February 21, 2006, Dubuisson had an x-ray of the left knee which revealed early degenerative joint disease.  Tr. 265.  On February 27, 2006, a cortisone injection (Kenalog /lidocaine) was administered to Dubuisson's left knee by  Dr. Williams. Id.   Dr. Williams's assessment was that Dubuisson suffered from degenerative joint disease of the left knee as a result of morbid obesity. Id.   Dr. Williams advised Dubuisson to call or return if the problem did not resolve. Id.

On April 3, 2006, Dubuisson again had an appointment with Dr. Williams

---

[13](...continued) in many people who are overweight. Type 2 diabetes, A.D.A.M. Encyclopedia, PubMed Health, U.S.National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/ PMH0001356/(Last accessed July 5, 2012).

[14]An effusion is a swelling caused by a collection of fluid. See Dorland's Illustrated Medical Dictionary, 595 (32nd Ed. 2012).

[15]Hemarthrosis is a collection of blood in a joint.  See  Dorland's Illustrated Medical Dictionary, 831 (32nd Ed. 2012).

regarding pain and swelling of the left knee. Tr. 260-261.  The physical examination revealed that Dubuisson was morbidly obese but in no distress; she had a large tender effusion on the left knee and there was joint line tenderness with rotation of the knee. Id.

On April 3, 2006, Dr. Husband completed a document entitled "Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities." Tr. 258-259. In that document Dr. Husband stated that Dubuisson had the ability to lift 10 pounds frequently and carry 10 pounds frequently; stand and walk 4 to 6 hours in and 8-hour workday; sit 8 hours with alternating sitting/standing at her option; push and pull the same amounts as she could lift and carry; occasionally bend, kneel, stoop, crouch, balance and climb; she had no limitations with respect to reaching, handling, fingering, feeling, seeing, hearing, speaking, tasting/smelling or continence; and she should avoid heights and moving machinery.  Id.

On May 19, 2006, Rita Aneja, M.D., reviewed Dubuisson's medical records and completed a functional assessment of Dubuisson on behalf of the Bureau of Disability Determination. Tr. 299-305.   Dr. Aneja found that Dubuisson had the ability to engage in a limited range of light work. Id.  The limitations were  that Dubuisson could only occasionally balance, use ramps and climb stairs, and  never climb ladders, ropes or scaffolds. Tr. 301.

In September 2006, Dr. Husband referred Dubuisson to Aliasghar Mohyuddin, M.D., for management of a recently diagnosed HIV infection. Tr. 314.   Dubuisson's CD4 count was appropriately high at 883[16]  but her viral load was also moderately elevated at

---

[16]"CD4 cells are a type of white blood cell that fights infection. Another name for them is T-helper cells. . . The CD4 count measures the number of CD4 cells in a sample of blood . . . Along with other tests, the CD4 count helps tell how strong your immune system

(continued...)

11

66,000.[17] Id.  Dr. Mohyuddin indicated that they could "observe and not start anti-retrovirals (sic), and just repeat a CD4 count/viral load on a periodic basis within a month or two; but [Dubuisson] was keen on getting antiretroviral therapy." Id.  Consequently, Dubuisson began HIV treatment with antiretroviral medication in October 2006 and tolerated the treatment. Tr. 316.  She was fully compliant with treatment, and as of December 2006, her viral load was undetectable. Tr. 318.

On March 9, 2007, Dubuisson had an appointment with Dr. Husband at which she stated that she was "[f]eel[ing] pretty well" and she had "[n]o complaints other than dry itchy scalp, small paronychia[18] of left index finger." Tr. 439.  A physical examination revealed no edema in Dubuisson's extremities. Id.

With respect to Dubuisson's morbid obesity,[19] Dr. Mohyuddin at an appointment on March 15, 2007, advised Dubuisson that "lifestyle changes are going to be absolutely essential." Tr. 319.   Dr. Mohyuddin "counseled her at some length about decreasing  caloric intake and gradually increasing exercise." Tr. 319.   The report of this

---

[16](...continued)
is, indicates the stage of your HIV disease, guides treatment, and predicts how your disease may progress. . . A normal CD4 count is from 500 to 1,500 cells. . . Public health guidelines recommend starting on preventive antiretroviral therapy if CD4 counts are under 200, whether or not you have symptoms." HIV,AIDS and the CD4 Count, WebMD, http://www.webmd.com/hiv-aids/cd4-count-what-does-it-mean (Last accessed July 2, 2012).

[17]HIV viral load is an important measurement of the amount of active HIV in the blood of someone who is HIV positive and also indicates if the individual's medication regimen is working.  HIV Viral Load - What Is It and Why Is It Important? About.com, http://aids.about.com/od/technicalquestions/f/viralload.htm (Last accessed July 2, 2012).

[18]Paronychia is defined as "inflammation involving the folds of tissue surrounding the nail[.]" See Dorland's Illustrated Medical Dictionary, 1384 (32nd Ed. 2012).

[19]Dubuisson was 6 feet tall and weighed 367 pounds. Tr. 29 and 318.

appointment indicates that Dubuisson's viral load was undetectable and her CD4 count was 1389.  Id.  Dr. Mohyuddin further noted that Dubuisson's gastroesophageal reflux disease (GERD) was controlled; she was no longer taking Prevacid; and she was "without any further symptoms. Id.   It was also noted that Dubuisson had a history of asthma but that she was off Singular and she was "still doing well without any wheezing." Id.   A pulmonary examination by Dr. Mohyuddin was unremarkable. Id.

On March 23, 2007, Dubuisson had an appointment with Dr. Husband regarding knee pain and swelling. Tr. 440.  It was observed by Dr. Husband that there was minimal swelling at the lateral joint line of the left knee and that Dubuisson had full range of motion. Id.   She also had negative McMurray's and Drawer's signs.[20] Id.   Dr. Husband administered a corticosteroid injection to Dubuisson's left knee. Id.   At an appointment on June 12, 2007, with Dr. Husband, Dubuisson reported no significant change or complaints. Tr. 436.  Dr. Husband advised Dubuisson to lose weight. Id.

On June 21, 2007, Dubuisson had an appointment with Dr. Mohyuddin regarding her HIV infection. Tr. 320-321.  Dr. Mohyuddin noted that Dubuisson "has been doing really well from the HIV standpoint." Tr. 320.  Her viral load was "barely detectable at 353" and her "CD4 count was 1549." Id.   The results of a physical examination were essentially normal, including a normal blood pressure of 122/80. Id.  She was still morbidly obese at 360 pounds.  Id.   Dr. Mohyuddin stated that her high blood pressure was

---

[20]Between the thighbone and the shinbone are two rings of cartilage called menisci which provide stability and cushion the knee joint, acting as shock absorbers. The McMurray's test or sign is to determine whether there is a meniscal tear.  The Drawer's test or sign is to determine whether there is a rupture of the anterior or posterior ligaments of the knee. See Dorland's Illustrated Medical Dictionary, 1888 & 1894 (32nd Ed. 2012).

controlled, and her GERD and asthma were stable. Tr. 321.  The record further shows that Dubuisson's pulmonary specialist Kim Norville, M.D., also examined Dubuisson on June 21, 2007. Tr. 377-378.    Dubuisson told Dr. Norville that she was feeling better, she had increased energy and she had not needed to use her inhaler. Id.  Dr. Norville stated that Dubuisson's obstructive sleep apnea was well controlled with CPAP[21] therapy. Id.

On September 20, 2007, Dubuisson had an appointment with Dr. Mohyuddin regarding her HIV infection. Tr. 322-323.  The report of this appointment reveals that she was asymptomatic. Id. Her viral load was barely detectable and her CD4 count was greater than 1500.  Id.   Her high blood pressure was well-controlled and her GERD and asthma were stable.  Id.   Also, on September 20, 2007, Dr. Norville found that Dubuisson's obstructive sleep apnea "appeared to be well controlled while she was compliant with the CPAP use." Tr. 381.

Dubuisson had an appointment with Dr. Mohyuddin on October 18, 2007. Tr. 383-384.  Dr. Mohyuddin noted in the report of that appointment that Dubuisson had been "off all antiretrovirals for at least three months." Tr. 383.  Dr. Mohyuddin noted that Dubuisson was under a lot of stress related to her marriage.  Id.  She told Dr. Mohyuddin that her husband had disappeared and that she suspected that he was with a girlfriend. Id.

On October 29, 2007, Dubuisson had an appointment with Dr. Williams. Tr. 434-435.   In the report of that appointment Dr. Williams stated that Dubuisson's HIV was "well controlled," "her viral load is almost undetectable and her CD4 count is normal," and "[s]he has not had any AIDS defining illnesses." Tr. 434. The results of a physical

---

[21]"CPAP" is an abbreviation for continuous positive air pressure.

examination were essentially normal, including she had "[n]o respiratory distress" and her extremities exhibited "[n]o calf tenderness or edema." Id.

On November 13, 2007, Dubuisson had an appointment with Kimberly F. Smith, M.D., a colleague of Dr. Williams, regarding pain in her left knee.[22] Tr. 432-433. Dubuisson complained of "a lump at the inside of the knee that she noticed for about a year." Id.  A physical examination of the knee revealed "no evidence of effusion" and "no ecchymosis."[23] Id. Dubuisson had "good" range of motion of the left knee. Id. Dubuisson had a negative anterior Drawer's sign. Id. Dubuisson did have some "tissue swelling just inferior and medial to the patella [knee cap]." Id.  However, the swelling was nontender. Id. Dubuisson did have tenderness "on palpation of the medial meniscus of the knee." Id.  Dr. Smith prescribed Naprosyn, referred her to an orthopedist for further evaluation, and referred her to radiology for an ultrasound of the soft tissue swelling. Id.

On January 17, 2008, Dubuisson had an appointment with Dr. Mohyuddin regarding her HIV infection. Tr. 388-389.  In the report of this appointment Dr. Mohyuddin stated that Dubuisson "has been doing extremely well from the HIV standpoint. Since her CD4 counts are so high and viral load is barely detectable.  There is no indication for antiretroviral at this time.  I have recommended a followup consultation approximately four months and obtaining a CD4 count and viral load just prior to the visit." Tr. 388.  Dr. Mohyuddin indicated that Dubuisson should reduce her caloric intake, increase exercise and

[22]The record reveals that Dr. Williams, Dr. Smith and Dr. Husband were all associated with Arnot Medical Services located in Canton, Pennsylvania.

[23]An ecchymosis is a bruise. See Dorland's Illustrated Medical Dictionary, 588 (32nd Ed. 2012).

follow with "Bariatrics" regarding possible weight loss surgery. Tr. 388-389. Dr. Mohyuddin further noted that Dubuisson's high blood pressure was "generally controlled." Tr. 389.

Upon referral from Dr. Husband, Dubuisson had an appointment on January 17, 2008, with Robert E. Cohen, M.D., an orthopedist, regarding her left knee pain. Tr. 390-391.  When Dr. Cohen reviewed Dubuisson's systems Dubuisson denied shortness of breath, chest pain, wheezing, and chronic cough.  Tr. 390.  It was noted that the review of systems was unremarkable. Id.   The results of a physical examination were essentially normal other than a "somewhat tender" swelling "on the anterior medial aspect approximately 4 cm x 5 cm" of the left knee.. Tr. 390-391.  It was stated, however, that she had good range of motion, negative varus and valgus stress,[24] negative anterior Drawer's sign, negative Lachman's sign,[25] mild pain with McMurray's test, good range of motion of the hip, and she was neurovascularly intact distally. Id.   Dr. Cohen sent Dubuisson for an MRI of the knee and he suspected that the swelling was a lipoma ( a benign tumor consisting of fat cells).  Id.

On January 25, 2008, Dubuisson had an appointment with Dr. Husband who in the report of that appointment noted that Dubuisson had no edema or tenderness in the

---

[24]This is a test where stress is placed on the knee in the direction of the center of the body (varus/medial) and also away from the center of the body (valgus/lateral).  The valgus stress test is to assess the health of the medial collateral ligament.  The varus stress test is to assess the health of the lateral collateral ligament. See  Walter L. Calmbach, M.D., et al., Evaluation of Patients Presenting with Knee Pain: Part 1. History, Physical Examination, Radiographs, and Laboratory Tests, American Family Physician, A peer-reviewed journal of the American Academy of Family Physicians, http://www.aafp.org/afp/2003/0901/p907.html (Last accessed July 5, 2012).

[25]This is another form of the Drawer's sign or test. See Dorland's Illustrated Medical Dictionary, 1893 (32nd  Ed. 2012).

extremities. Tr. 430.  Dr. Husband also stated that Dubuisson was suffering from depression and anxiety and prescribed the anti-depressant drug Celexa. Id.

On February 19, 2008, Dr. Cohen concluded Dubuisson suffered from thigh and knee cap pain and recommended "aggressive weight loss" and exercises to strengthen the quadriceps muscles. Tr. 392.

At an appointment on March 18, 2008, Dr. Husband found that Dubuisson had full range of motion of the knee and negative McMurray's and Drawer's signs. Tr. 431. She continued to have left knee tenderness. Id.  Dr. Husband again found knee tenderness at an appointment on April 29, 2008. Tr. 426.

In a report of a June 19, 2008, appointment Dr. Mohyuddin noted that Dubuisson had "been doing extremely well" but that she "needs to make substantial lifestyle changes for sustained weight loss." Tr. 324.

At an appointment on August 1, 2008, Dr. Husband observed that Dubuisson had some knee tenderness but  "minimal" swelling and normal range of motion. Tr. 427.

On August 3, 2008, Dubuisson was admitted to the Robert Packer Hospital, Sayre, Pennsylvania, for depression and suicidal thoughts. Tr. 307.  According to the discharge summary that treating psychiatrist, Jay Shah, M.D., prepared, the hospitalization was brought about as a result of Dubuisson's boyfriend breaking off their relationship because Dubuisson prior to engaging in unprotected sex with her boyfriend failed to inform him of her HIV infection. Id.   The boyfriend also allegedly threatened to bring charges against Dubuisson. Id.   It was also noted that Dubuisson had no prior psychiatric hospitalizations and no prior suicidal behavior. Id.

During the hospitalization, Dubuisson received support and reassurance from

17

the staff. Id.  She slept well, and her affect became much brighter. Tr. 307-308.   Also, during

her stay at the hospital, Dubuisson became excited when she received a call from her

boyfriend stating that he wanted to work things out. Tr. 308.  After that call Dubuisson started

demanding that she be discharged from the hospital. Id.   Four days after her admission,

Dubuisson was discharged from the hospital on August 7, 2008. Tr. 307.  At discharge, Dr.

Shah reported that her mood was euthymic[26] and her affect was full and appropriate.  Id.

Dubuisson displayed no thought disorders or perceptual disturbances and she no longer had

suicidal thoughts or plans. Id.  Dubuisson was alert with fair concentration ability and

average memory and insight. Id.

        The  discharge  diagnosis  was  adjustment  disorder  with  mixed  emotional

disturbance and disturbance of conduct; depressive disorder, not otherwise specified; and

borderline intellectual functioning. Id.   The basis for the diagnosis of borderline intellectual

functioning is unclear. There is no indication that Dr. Shah administered any intelligence

tests.   At  the  time  of  admission  Dr.  Shah  gave  Dubuisson  a  Global  Assessment  of

Functioning (GAF) score of 30 and at discharge a GAF score of 50.[27] Id.   Dr. Shah noted

---

        [26]A euthymic mood is a normal non-depressed mood, one where the range of
motion is neither depressed nor highly elevated. See Dorland's Illustrated Medical
Dictionary, 655 (32nd Ed. 2012)(Euthymia is defined as "a state of mental tranquility and
well-being; neither depressed nor manic.").

        [27]The GAF score allows a clinician to indicate his judgment of a person's overall
psychological, social and occupational functioning, in order to assess the person's mental
health illness. Diagnostic and Statistical Manual of Mental Disorders 3–32 (4th ed. 1994). A
GAF score is set within a particular range if either the symptom severity or the level of
functioning falls within that range. Id. The score is useful in planning treatment and
predicting outcomes. Id.  The GAF rating is the single value that best reflects the
individual's overall functioning at the time of examination.  The rating, however, has two
components: (1) symptom severity and (2) social and occupational functioning.  The GAF
                                                              (continued...)

that Dubuisson's condition upon discharge had "significantly improved." Id.  The record does not reveal that Dr. Shah provided Dubuisson with any further treatment after her discharge. However, at discharge "strong emphasis was placed on outpatient care" and "Crisis [phone] numbers were given to" Dubuisson. Tr. 308.

On August 21, 2008, Dubuisson had an appointment with Dr. Mohyuddin regarding her HIV infection. Tr. 326-327.  Dr. Mohyuddin in the report of this appointment stated that Dubuisson was "doing well without the use of antivirals." Tr. 326.  Dr. Mohyuddin noted that an examination of Dubuisson's extremities revealed no edema and her motor strength and reflexes were normal. Id.   Dubuisson weighed 362, a loss of 11 pounds. Id.

On August 27, 2008, Dubuisson underwent a mental health intake evaluation at Northern Tier Counseling . Tr. 335-337.  The report of the evaluation was signed by a clinician as well as a psychiatrist on September 9, 2008. Tr. 337.  It was noted on the report that Dubuisson was applying for disability and that she had no history of mental health treatment. Tr. 335-336.  With respect to functional impairments, Dubuisson was assessed as having no impairment for work.  Tr. 336.  On an initial treatment plan dated September

---

[27](...continued)
is within a particular range if either the symptom severity or the social and occupational level of functioning falls within that range.  When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the worse of the two.  Thus, a suicidal patient who is gainfully employed would have a GAF rating below 20.  A GAF score of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas.  A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas,  such as work or school, family relations, judgment, thinking or mood. Id.  A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning.  Id.  A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id.

5, 2008, Dubuisson was diagnosed as suffering from depressive disorder, not otherwise specified, and given a GAF score of 45. Tr. 338.

On November 4, 2008, Dubuisson had an appointment with Dr. Husband regarding left knee pain. Tr. 421.  The report of this appointment states that Dubuisson was "walking quite a bit." Tr. 421.  Dubuisson told Dr. Husband that her knee does not swell. Id.  It was also stated that a recent HgbA1C blood test was 4.8, indicating that her diabetes was under control.[28] Id.  A physical examination of Dubuisson's extremities revealed no edema, tenderness or cords (varicose veins). Id.  She did have diffuse tenderness without effusion at the medial and lateral joint line of the left knee.  Id.  She had full range of motion of the left knee and a negative Drawer's and McMurray's sign. Id.  Dr. Husband's assessment was that Dubuisson suffered from left knee pain secondary to degenerative joint disease, morbid obesity, controlled diabetes, controlled high blood pressure, and an HIV infection. Id.

On November 5, 2008, Joseph J. Kowalski, Psy.D., a state agency psychologist, reviewed Dubuisson's medical records and determined that she suffered from depression but that Dubuisson was "able to meet the basic mental demands of competitive

_____

[28]The HgbA1C or A1C blood test is a test that measures the amount of glycated hemoglobin or glycohemoglobin in the blood.  It is used to monitor the control of diabetes mellitus.  Glycohemoglobin is hemoglobin to which glucose is bound.  Glucose stays attached to hemoglobin for the life of the red blood cells, 120 days.  A1C reflects the average blood glucose and gives a good estimate of how well an individual manages his or her diabetes over the prior 2 to 3 months.  The normal A1C level is 7% according to the American Diabetes Association and 6.5% according to the American Association of Clinical Endocrinologists.  An A1C level of 5% translates to an estimated average glucose of 97. American Diabetes Association, Estimated Average Glucose, http://www.diabetes. org/living-with-diabetes/treatment-and-care/blood-glucose-control/estimated-average-gluco se.html (Last accessed July 3, 2012). Normal fasting blood glucose is 70-99 and normal blood glucose 2 hours after eating is 70-145. Diabetes Health Center, Blood Glucose, WebMD, http://diabetes.webmd.com/blood-glucose?page=3 (Last accessed July 3, 2012).

work on a sustained basis despite the limitations resulting from her impairment." Tr. 345.  Dr. Kowalski concluded that Dubuisson is able to make simple decisions, carry out very short and simple instructions, sustain an ordinary routine without special supervision, manage the mental demands of many types of jobs not requiring complicated tasks and has no limitations with respect to her understanding and memory. Tr. 345.

On November 10, 2008, Sharon A. Wander, M.D., a state agency physician, reviewed Dubuisson's medical records and concluded that Dubuisson had the residual functional capacity to engage in the full-range of light work. Tr. 360-366.

On December 18, 2008, Dubuisson had an HIV follow-up appointment with Dr. Mohyuddin. Tr. 401-404.  At that appointment Dubuisson told Dr. Mohyuddin that she was doing well and had lost 20 pounds "with increased walking and drinking more water." Tr. 401. The results of a physical examination were essentially normal, including she had normal range of motion and gait, no edema, and her mood and affect were normal . Tr. 403.  It was stated that Dubuisson's depression was stable; her diabetes was well controlled; she had some improvement with respect to obesity; her high blood pressure was controlled; and her arthralgias[29] were "well controlled."  Id.

On January 13, 2009, Dr. Husband noted that Dubuisson's diabetes was well controlled and she  was feeling well. Tr. 419.   The results of a physical examination were essentially normal, including she had no edema in the extremities and good range of motion. Id.  It was stated that she had diffuse tenderness at the medial joint line of the left knee. Id. The assessment was that Dubuisson suffered from asymptomatic HIV, knee pain, controlled

---

[29]Arthralgia is defined as "pain in a joint."  Dorland's Illustrated Medical Dictionary, 150 (32nd Ed. 2012).

high blood pressure and stable diabetes. Id.

At an appointment on March 19, 2009, Dubuisson told Dr. Mohyuddin that she was walking 1 to 2 hours per day, that her depression was controlled, and that she had no shortness of breath or wheezing. Tr. 407.  Dr. Mohyuddin stated that Dubuisson was not in need of HIV antiviral treatments; she needed to reduce her caloric intake; and her depression, GERD, diabetes and high blood pressure were controlled. Id.

At an appointment with Dr. Husband on April 21, 2009, Dubuisson was feeling reasonably well with no new complaints. Tr. 420.   However, her GERD was acting up and Dr. Husband restarted her on Prevacid. Id.   Dubuisson's depression was stable and her diabetes and high blood pressure controlled. Id.

On June 12, 2009, Dubuisson told Dr. Husband that she had ongoing headaches, off and on over the past month. Tr. 418.  The results of physical examination were essentially normal other than diffuse tenderness along the medial joint of the knees. Id.  Dubuisson had no edema, no joint effusion and full range of motion. Id.

On July 16, 2009, Dubuisson had an appointment with Bilal Sadiq, M.D., a colleague of Dr. Mohyuddin. Tr. 409-412.  At this appointment, Dubuisson did not have any specific complaints or questions. Tr. 409.   When Dr. Sadiq reviewed Dubuisson's systems, Dubuisson denied fever, chills, weight loss, malaise/fatigue and weakness; she denied shortness of breath and wheezing; she denied heartburn, nausea, myalgias,[30] neck pain, back pain, joint pain, dizziness, depression, hallucinations and memory loss. Tr. 410. The results of a physical examination were essentially normal, including normal ranges of motion

[30]Myalgia is defined as "pain in a muscle or muscles." Dorland's Illustrated Medical Dictionary, 1214 (32nd  Ed. 2012).

with respect to her musculoskeletal system. Tr. 411. Her gait was normal. Id.   Dubuisson did have a small lump on the back of her neck which Dr. Sadiq suspected was a lipoma. Id. It was stated that Dubuisson's mood and affect were normal. Id.

On August 18, 2009, Dubuisson had an appointment with Stephen Saylor, a certified physician assistant. Tr. 368-371.  When Mr. Saylor reviewed Dubuisson's systems, Dubuisson denied fatigue, malaise, cough, shortness of breath, wheezing, chest pain, abdominal pain, disorientation, hallucinations, hostility, irritability, mood swings, obsessive thoughts or suicidal ideation. Tr. 369. The results of physical examination were essentially normal. Tr. 370. She had a normal neurological exam, motor strength, no joint swelling of the knees and mild crepitus [crackling sound] of the left knee. Tr. 370.   It was stated that Dubuisson's HIV infection was "stable with a declining viral load not on medication." Tr. 371.

In September, 2009, Dubuisson complained of left knee pain exacerbated by going up and down stairs. Tr. 413.   A physical examination revealed no obvious swelling, redness or bruising. Tr. 411.  There were no objective findings, just subjective tenderness. Tr. 415.

During the initial claim process, Dubuisson was requested to provide information regarding her functional limitations.   On September 24, 2008, Dubuisson indicated in a document entitled "Function Report - Adult" that she "mostly" sits because she is "tired all the time," she gets "sick a lot so [she] sit[s] [and] watch[es] TV, eat[s] and [at] night time take[s] a shower and go[es] [to] bed." Tr. 148.   Dubuisson, however, stated that she "like[s] to take walks." Tr. 149.   Dubuisson is able to take care of her own personal needs, including dressing, bathing, hair care, shaving, and feeding herself. Tr. 149. Dubuisson needs no reminders to take care of personal needs and grooming. Tr. 150.  She

did contend that she needed reminders to take her medications. Id.   Dubuisson is able to prepare her own meals and stated that she is able to "wash dishes" and "put clothes away." Id.   Dubuisson noted that she is able to do  "some housework with help[;]" that when going out that she is able to ride in a car and use public transportation; that she is able to go out alone, drive a motor vehicle, shop in stores and by phone and computer; and that she is able to pay bills, count change, handle a savings account and use a checkbook and money orders.. Id.   Dubuisson indicated that she enjoys reading and listening to music.  Tr. 152. Dubuisson  when given an opportunity to do so noted no problem with reaching, talking, hearing , seeing, following instructions and using her hands. Tr. 153.

## DISCUSSION

The administrative law judge at step one of the sequential evaluation process found that Dubuisson had not engaged in substantial gainful work activity since August 22, 2008, the date her application for SSI benefits was filed. Tr. 12.

At step two of the sequential evaluation process, the administrative law judge found that Dubuisson had the following severe impairments: "morbid obesity; human immuno-deficiency virus (HIV); degenerative joint disease of the left knee; diabetes mellitus; sleep apnea; asthma and depression[.]" Id.   The administrative law judge found that Dubuisson's high blood pressure and GERD were non-severe impairments because they were well-controlled with medication. Id.

At step three of the sequential evaluation process the administrative law judge found that Dubuisson's impairments did not individually or in combination meet or equal a listed impairment. Tr. 12-15.

At step four of the sequential evaluation process the administrative law judge

24

found that Dubuisson could not perform her prior work as an assembly worker but that she had the residual functional capacity to perform a limited range of unskilled, light work.  Tr. 15-18.   Specifically, the administrative law judge found that Dubuisson could perform unskilled, light work which involved

> the ability to lift no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. The claimant can perform occupations that require no more than occasional postural maneuvers such as balancing, stooping, kneeling and climbing on ramps and stairs. She can perform occupation that do not require climbing on ladders, crouching or crawling.  The claimant can perform a job that does not require pushing and pulling with her left lower extremity.  The claimant has the capacity to perform a job that allows her to avoid even moderate exposure to fumes, odors, dusts, gases, chemical irritants, environments with poor ventilation, hot or cold temperature extremes, extreme dampness and extreme humidity.  The claimant can perform occupations requiring no more than simple, routine, repetitive tasks that are not performed in a fast-paced production environment and that involve only simple, work-related decisions, and in general, relatively few work place changes.

Tr. 15.   In concluding that Dubuisson had the residual functional capacity to engage in this limited range of unskilled, light work, the administrative law judge relied, *inter alia*, on the opinions of the state agency physicians, Dr. Aneja and Dr. Wander,  and the opinion of state agency psychologist, Dr. Kowalski.   The administrative law judge further found that Dubuisson's statements concerning her limitations were not credible to the extent that they were inconsistent with the ability to perform this limited range of unskilled, light work. Tr. 16-18.

At step five, the administrative law judge based on a residual functional capacity of a limited range of light work as described above and the testimony of a vocational expert found that Dubuisson had the ability to perform work as a surveillance system monitor (an unskilled, sedentary position), document preparer (also an unskilled, sedentary position),

and an information clerk (an unskilled, light position),  and that there were a significant number of such jobs in the state of Pennsylvania. Tr. 19 and 41-42.

The administrative record in this case is 450 pages in length and we have thoroughly reviewed that record.  The administrative law judge did an adequate job of reviewing Dubuisson's vocational history and medical records in his decision. Tr. 10-20. Furthermore, the brief submitted by the Commissioner sufficiently reviews the medical and vocational evidence in this case. Doc. 15, Brief of Defendant.

Dubuisson  argues that the administrative law judge erred when he failed to (1)  give significance to the opinion of Dr. Shah, the psychiatrist who treated Dubuisson at the beginning of August, 2008,  (2) ask a hypothetical question which reflected all of Dubuisson's limitations, and (3) sustain his burden with respect to showing a significant number of jobs in the national economy.  We find no merit in Dubuisson's arguments.

The Social Security regulations require that an applicant for supplemental security income benefits come forward with medical evidence "showing that [the applicant] has an impairment(s) and how severe it is during the time [the applicant] say[s] [he or she is] disabled" and "showing how [the] impairment(s) affects [the applicant's] functioning during the time [the applicant] say[s] [he or she is] disabled."  20 C.F.R. §§ 404.1512(c) and 416.912(c).  Dubuisson failed to provide such evidence.  No treating physician or psychologist provided a statement indicating that Dubuisson had functional limitations for the requisite continuous 12 month period[31] that would prevent her from engaging in the limited

---

[31]As stated earlier in this memorandum to receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in

(continued...)

range of light work set by the administrative law judge.

In fact the record reflects a mental health intake evaluation which was signed by a psychiatrist stating that Dubuisson had the functional ability to work.  Tr. 335-337. Furthermore,  Dr. Kowalski's evaluation indicates that Dubuisson was not disabled from a mental health standpoint.  As for Dubuisson's physical impairments, the treatment notes reveal that her medical conditions were under control, including her HIV infection, and the opinions of Dr. Aneja and Dr. Wander support the conclusion that Dubuisson had the ability to engage in a limited range of light work.  Tr. 299-305 and 360-366.

The record contains functional assessments from two state agency physicians and one state agency psychologist which support the administrative law judge's residual functional capacity determination.  The administrative law judge's reliance on those three assessments was appropriate. See Chandler v. Commissioner of Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011) ("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]").    Dubuisson's claim that the administrative law judge failed to pose an accurate hypothetical to the vocational expert is totally devoid of merit in light of the opinions of the state agency physicians and psychologist and Dubuisson's medical treatment records. The administrative law judge appropriately took into account Dubuisson's functional limitations when framing a hypothetical question as well as when setting the residual functional capacity in his decision of January 25, 2010.

---

[31](...continued)
death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).

As for the claim that the administrative law judge failed to sustain his burden with respect to showing a significant number of jobs in the national economy, the record reflects that the vocational expert testified that there were 569 surveillance monitor positions in the state of Pennsylvania, 4827 document preparer positions and 3693 information clerk positions.  Tr. 41-42.  Furthermore, the vocational expert testified that there were larger numbers of such positions in the national economy. Id.  Dubuisson does not reference any authority indicating that this quantum of evidence is insufficient to sustain an administrative law judge's step five analysis.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence.  We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.


s/A. Richard Caputo
A. RICHARD CAPUTO
United States District Judge


Dated: July 12, 2012